IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**CLAUDIA INGLE,** )
)
       Plaintiff, )
)
v. ) **Civil No. 10-1002-DRH-CJP**
)
**MICHAEL J. ASTRUE,** )
**Commissioner of Social Security,** )
)
       Defendant. )

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to Chief Judge David R. Herndon pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Claudia Ingle seeks judicial review of the final agency decision finding that she is not disabled and denying her Disability Insurance Benefits (DIB).

## Procedural History

Plaintiff filed an application for DIB in January, 2008, alleging disability beginning on October 31, 2006. (Tr. 15). She claims disability due to bi-polar disorder. (Tr. 119).

After the application was denied initially and on reconsideration, a hearing was held before Administrative Law Judge (ALJ) Gary L. Vanderhoof. (Tr. 30-56). ALJ Vanderhoof denied the application for benefits in a decision dated April 19, 2010. (Tr. 15-24). The Appeals Council denied review, and this decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Ms. Ingle filed a motion for summary judgment at Doc. 12. In her memorandum in support, she raises the following points:

-1-

1. The ALJ erred in weighing the opinions of her treating doctor, Dr. Qureshi.

2. The ALJ failed to account for limitations in concentration, persistence or pace and in social functioning in his residual functional capacity findings.

3. The ALJ failed to reconcile a conflict between the testimony of the vocational expert and the *Dictionary of Occupational Titles*.

4. The ALJ did not properly analyze the medical records in that he placed too much emphasis on hopeful, positive remarks about plaintiff's condition.

5. The assessment of plaintiff's credibility was faulty.

## Applicable Legal Standards

In order to receive DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, a person is disabled when he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found

disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner's burden at step five is to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Ms. Ingle is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richard v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Vanderhoof followed the five-step analytical framework described above. He

determined that Ms. Ingle had not been engaged in substantial gainful activity since the alleged onset date. He found that she has severe impairments of bipolar disorder and anxiety, and that her condition does not meet or equal a listed impairment. The ALJ found that Ms. Ingle has the residual functional capacity (RFC) to perform work at all exertional levels, but she is limited to simple, routine work. A vocational expert (VE) testified that she was unable to perform her past relevant work as an office manager and a trucking company terminal manager. In response to a hypothetical question, the VE testified that a person with plaintiff's RFC could do the jobs of hand packager, office cleaner and machine packager, which exist in significant numbers in the economy. The ALJ accepted this testimony and found that plaintiff could perform those jobs and was therefore not disabled. (Tr. 15-24).

### The Evidentiary Record

The Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.    Agency Forms**

Ms. Ingle was born in 1950, and was almost 56 years old when she allegedly became disabled. (Tr. 115). Her illness first interfered with her ability to work in October, 2004. She stopped working on October 31, 2006, because her "husband was transferred." (Tr. 119). She worked as a terminal manager for a trucking company from 1984 through 1997, and as an office manager for a construction company from 1997 through October, 2006. (Tr. 120). She had four years of college education. (Tr. 128).

She is insured for DIB through December 31, 2011. (Tr. 15).

**2.    Evidentiary Hearing**

Plaintiff was represented at the hearing by attorney Joni Beth Bailey. (Tr. 30).

Psychologist Betty J. Feir, PhD, testified as a medical expert.[1] She testified that, based on her review of the medical records, Ms. Ingle has been diagnosed with bi-polar disorder. She was taking medication. She had "overall high GAF scores in the 60s and 80s." (Tr. 35). Her condition did not meet a listing. (Tr. 35). She had mild limitation of activities of daily living, moderate limitation of social activities and of maintaining concentration, persistence and pace. She had no periods of decompensation. (Tr. 36). She would be unable to carry out detailed instructions. (Tr. 37).

Dr. Feir testified that plaintiff's treating doctor, Dr. Qureshi (incorrectly referred to as "Karesh" in the transcript) indicated in a report that she had marked limitations in a number of areas, but that this assessment was "totally inconsistent with the other records." (Tr. 36-37).

Ms. Ingle testified that she stopped working on October 31, 2006, when she and her husband moved from Mattoon, Illinois. Her husband took a transfer in part because she was having problems at work. She applied for jobs in accounting and office management positions after they moved, but she was not hired. She quit applying because, after they traded in their car, it upset her so much just to drive a different car that she felt she would not be able to work. (Tr. 46).

She had tried different medications, and was taking Zyprexa at the time of the hearing, which was helping her. It has side effects of weight gain and sleeping a lot. (Tr. 44-45). She sleeps 10 hours a night and 2 more during the day. (Tr. 48).

Ms. Ingle testified that her memory is not good. (Tr. 48). She has good days and bad days. Any time she has to do something outside her home, she gets anxious. On her worst days, she is not capable of taking care of her daily routine. (Tr. 50).

Bob Hammond testified as a vocational expert (VE). The ALJ asked him to assume a

---

[1]This witness is incorrectly referred to as "Betty Thayer" in the transcript of the hearing. See, Tr. 15.

person with mild restrictions of activities of daily living, moderate limitation of ability to maintain attention, concentration and pace, moderate limitation of social functioning and no decompensation or "C criteria."[2] She was limited to routine, repetitive work. The VE testified that she would be unable to do plaintiff's past work. She would be able to do the work of hand packer, office cleaner, and machine packager, each of which exist in significant numbers in the local and national economy. (Tr. 52-53).

### 3. Medical Records

Records from primary care physician Gary Mikel indicate a history of depression dating back to 2001. (Tr. 204-222).

Ms. Ingle was seen in the Indiana University School of Medicine Department of Psychiatry from February, 2006, through September, 2006. She was treated for depression with medication and therapy. She had some suicidal ideation. (Tr. 574-585). On the initial assessment, her current GAF was 50. (Tr. 577). It was noted that she had multiple stressors in that her mother had possible Alzheimer's disease and her daughter had serious health problems. In July, 2006, she reported that she was stressed because she hated her job and because of a "potential move due to her husband's job." Her current GAF was 50, and GAF over the past year was 55. (Tr. 582).

Ms. Ingle was seen by Dr. Khosrowshahi on April 16, 2007, for complaints of memory problems and cognitive difficulties. She was taking care of her elderly mother. She had a history of depression and anxiety. She was taking Effexor, Wellbutrin and Klonopin. He recommended that she have a brain MRI. (Tr. 299-301). An MRI was done on April 19, 2007. It showed biparietal cortical atrophy, mild brainstem atrophy and moderate cerebeller atrophy.

---

[2]The "C criteria" are part of the analysis of whether a claimant meets a listed impairment. Plaintiff does not challenge the ALJ's conclusion that she does not meet or medically equal a listed impairment.

(Tr. 302).

On April 17, 2007, plaintiff was seen by Dr. David Meyer of Paducah Psychiatry Group. She gave a history of intermittent depression since the birth of her daughter in 1982. Her mother had dementia and lived with her, and her daughter had serious health problems, which stressed her. She sometimes felt she did not want to live. Dr. Meyer felt she had "an unusual variant of depression, probably meets criteria for hysteroid dysphoria, and certainly does not meet duration criteria for major depression." He assessed a current GAF of 55. (Tr. 315).

Plaintiff saw Dr. Meyer on May 31, 2007. She told him she was planning on committing suicide by taking an overdose of medication. Her husband had stayed up with her all night, and she was sobbing and did not want to live. (Tr. 317). She was voluntarily admitted to Harrisburg Medical Center on that date, with depression and suicidal thoughts. (Tr. 312). She came under the care of Dr. Qureshi, who noted on admission that she was labile and crying with pressured speech. She was circumstantial and tangential. Her judgment and insight were impaired. He assessed her GAF at 30 on admission. He noted that she had been treated for depression for years. Her elderly mother had moved in with her in November, and she was having difficulty taking care of her. She denied having bipolar disorder, although "she is quite labile and certainly presents with those symptoms." (Tr. 312-313). Her medication was adjusted, and she improved. She was discharged on June 8, 2007, with a diagnosis of bipolar disorder. (Tr. 307-308).

Ms. Ingle was seen by Dr. Qureshi about 12 times between June, 2007, and February, 2008. (Tr. 318-342). Dr. Qureshi used forms to record his office notes. The findings on mental status examination were recorded on a pre-printed checklist, while other parts of the office notes were handwritten by the doctor. The diagnosis continued to be bipolar disorder. The doctor's handwriting is very difficult to read. However, in general, the findings on mental status examination were unremarkable. Dr. Qureshi usually recorded that Ms. Ingle had normal attention, concentration, memory, intellect, insight, judgment and abstraction, and that her

perception, thought content and thought process were normal. Plaintiff was seen by a nurse or physician's assistant in the office on October 24, 2007; that provider assessed mild impairment of attention, concentration and memory, and assigned a GAF of 60. (Tr. 332). Dr. Qureshi generally assessed a GAF of 60 or 65. On one visit, January 14, 2008, he assessed mild impairment of attention and concentration. (Tr. 324).

Ms. Ingle again saw Dr. Qureshi on April 24, 2008 He noted that she was "getting more paranoid." (Tr. 481). On exam, her affect was blunted and restricted and her psychomotor activity was retarded. Her thought content was paranoid and he noted impairments in attention, concentration and intellect. Her GAF was 50. Dr. Qureshi continued her medications (Abilify, Klonopin and Effexor). (Tr. 481-82).

From June, 2008, through April, 2009, Dr. Qureshi noted continuing paranoia. He documented mild impairment of attention and concentration, and he assessed her GAF at 45. Her medications were adjusted. On June 5, 2008, Abilify was discontinued and Zyprexa was started. (Tr. 472-480).

Ms. Ingle was seen by counselors at Associated Psychotherapists on Dr. Qureshi's referral, beginning on June 13, 2008. She attended six counseling sessions through August 27, 2008. (Tr. 520-526). On the first visit, she told the counselor that she had moved to southern Illinois in November, and then had a "nervous breakdown" for which she was hospitalized. She was unable to return to work. She identified her primary stressor as "dealing with SSD denial." She said that her anxiety had been severe and constant before her medication was changed from Abilify to Zyprexa. The Axis I diagnosis was bipolar with anxiety disorder. Her GAF was assessed at 41. (Tr. 525). On July 15, 2008, she reported that she had gained weight as a side effect of Zyprexa. Her mood was depressed and her inability to work was impacting her self esteem and identity. (Tr. 521). On August 4, 2008, plaintiff told the counselor that Zyprexa made her feel sedated. (Tr. 521).

On July 6, 2009, plaintiff told Dr. Qureshi that she was more depressed. On mental status exam, she was unremarkable except for mild impairment in her attention and concentration. Her GAF was assessed at 65. (Tr. 470).

On July 31, 2009, Dr. Qureshi completed a Mental Impairment Questionnaire. (Tr. 566-571). He indicted that her current GAF was 45, and that her highest GAF in the past year was 65. He assessed her as "seriously limited, but not precluded" in each of 16 enumerated mental abilities and aptitudes, including "make simple work-related decisions" and "ask simple questions or request assistance." (Tr. 568). He indicated that she had marked limitation in the functional areas of activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace, and said she had 3 episodes of decompensation in the last 12 months. (Tr. 570). Dr. Qureshi did not complete the part of the form which asked for the dates of the episodes of decompensation. (Tr. 570).

On December 15, 2009, Ms. Ingle told Dr. Qureshi that her mother had died and she was feeling "a little sad." (Tr. 572). Her mental status examination was unremarkable except for mild impairment in attention and concentration. Her GAF was 60. She was to continue taking Zyprexa, Klonopin and Effexor, and to return in 4 months. (Tr. 573).

**4.      State Agency Consultant Assessments**

On April 6, 2008, state agency consultant Margaret Wharton, a psychologist, completed a Psychiatric Review Technique form. (Tr. 435-448). She concluded that Ms. Ingle has bipolar syndrome, and that she has moderate limitation in activities of daily living, maintaining social functioning and in maintaining concentration, persistence or pace. She also found that there had not been any episodes of decompensation. She concluded that the "B" and "C" criteria were not satisfied, and that plaintiff's condition therefore does not meet or equal a listed impairment.

Dr. Wharton also completed a Mental Residual Functional Capacity Assessment form on April 6, 2008. (Tr. 449-452). She opined that plaintiff was not significantly limited in most

areas of mental activities, but did note moderate limitation in the ability to understand and remember detailed instructions, ability to maintain attention and concentration, and ability to carry out detailed instructions. Dr. Wharton concluded that plaintiff's interpersonal and adaptive skills are within normal limits and that her "cognitive and attentional skills are intact and adequate for simple one-two step work tasks." (Tr. 451).

On May 27, 2008, a second state agency consultant signed a form indicating that he agreed with Dr. Wharton's assessment. In addition to other materials, he reviewed Dr. Qureshi's note of April 24, 2008, in which Dr. Qureshi assessed a GAF of 50. (Tr. 461-463).

**5.** **Medical Interrogatory**

On March 20, 2009, Dr. Glenna Griffin, PhD, answered a Medical Interrogatory questionnaire as an impartial medical expert. (Tr. 464-468). In answer to question number 6, Dr. Griffin stated that there was not enough "objective medical and other evidence" to allow her to opine about the nature and severity of plaintiff's impairments. She said that testing was needed, including WAIS-III (IQ test), WMS-III (memory test) and TOMM (Test of Memory Malingering). In response to number 7, she stated that plaintiff has "memory complaints which have not been evaluated." (emphasis in original). She also stated that "A psychological exam is necessary to get objective medical evidence of the claimant's mental disorder and her fluctuating depressive disorder." (Tr. 464). She stated that she was unable to rate plaintiff's functional limitations due to "insufficient evidence." (Tr. 465). She was also unable to determine whether plaintiff meets or equals a listed impairment due to "insufficient medical evidence." (Tr. 466).

**Analysis**

In her first and fourth points, plaintiff takes issue with the ALJ's analysis of the medical evidence.

The ALJ gave no weight at all to Dr. Qureshi's functional analysis because his opinion was contradicted by the treatment records and by the level of plaintiff's activities. He accepted

the testimony of the medical expert, Dr. Feir, that plaintiff had mild limitations of daily activities, moderate limitations in attention and concentration, no episodes of decompensation and that she was capable of simple, routine work. (Tr. 21-22).

The ALJ erred in several respects in his analysis of the medical evidence. "The ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion." *Vilano v. Astrue,* **556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.** In analyzing the evidence, the ALJ errs when he cherry-picks evidence that supports his conclusion and ignores evidence that favors the claimant. *Myles v. Astrue***, 582 F.3d 672, 678 (7th Cir. 2009).**

Plaintiff correctly points out that the ALJ relied on parts of the medical evidence which indicated that plaintiff was doing well, while ignoring parts which documented that she was doing poorly. This is illustrated by the manner in which the ALJ treated the evidence of plaintiff's GAF scores.

Mental health clinicians commonly use a multi axial system to assess a patient's condition. "A multi axial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome." *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 28 (Text Revision, 4th ed. 2000)* ("DSM-IV"). The DSM-IV assessment has five axes, as follows:

| | |
|---|---|
| Axis I | Clinical Disorders |
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders |
| | Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychosocial and Environmental Problems |
| Axis V | Global Assessment of Functioning. |

At Axis V, the clinician uses the GAF scale to report his or her "judgment of the individual's overall level of functioning." DSM-IV at 32. The GAF scale consists of ten ranges

of ten points each, from 0 to 100. DSM-IV at 32-34. The clinician is rating symptom severity and functioning, and is to assign the rating that reflects the worse of the two. DSM-IV at 32-33.

Because the GAF score measures both the severity of symptoms as well as the level of functioning, and it reflects the worse of the two, the Seventh Circuit has held that "the score does not reflect the clinician's opinion of functional capacity" and the ALJ is not required to determine disability "based entirely" on the GAF score. ***Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).** However, the Seventh Circuit has also held that, while the ALJ need not base his opinion "entirely on GAF scores," it is error for the ALJ to discuss only high scores and ignore evidence of low scores. ***Walters v. Astrue*, 2011 WL 5024149, \*5 (7th Cir. 2011)**.

Here, despite numerous assessments in the record, the ALJ made only one reference to plaintiff's GAF. The ALJ said that Dr. Feir, the medical expert, testified that plaintiff had bipolar disorder with GAF scores "as high as 80 (no impairment)." (Tr. 21). This statement is misleading in two respects. First, Dr. Feir actually testified that Ms. Ingle had "overall high GAF scores in the 60s and 80s." The ALJ did not mention the scores in the 60's. Further, Dr. Feir cited to Exhibit 2-F, wherein plaintiff had been assessed a GAF of 80. (Tr. 35). The record to which Dr. Feir refers was from January 4, 2005. (Tr. 247). Both Dr. Feir and the ALJ failed to note that the GAF score of 80, which he said indicated no impairment, was assessed well before the alleged date of disability.

Since the alleged date of disability, Ms. Ingle's GAF score has been assessed at **30** (Tr. 312), **41** (Tr. 525), **45** (Tr. 472-480, 566-571), **50** (Tr. 481, 577, 582), **55** (Tr. 315), **60** (Tr. 573), **60-65** (Tr. 318-342), and **65** (Tr. 470). These numbers correspond to the following ranges:

| | |
|---|---|
| 61-70 | **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (*e.g.*, occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**. |
| 51-60 | **Moderate symptoms** (*e.g.*, flat affect and circumstantial speech, |

| | |
|---|---|
| | occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (*e.g.*, few friends, conflicts with peers or co-workers). |
| 41-50 | **Serious symptoms** (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (*e.g.*, no friends, unable to keep a job). |
| 31-40 | **Some impairment in reality testing or communication** (*e.g.*, speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). |
| 21-30 | **Behavior is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment** (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (*e.g.*, stays in bed all day, no job, home, or friends). |

The ALJ based his decision, in part, on the fact that Ms. Ingle's GAF had been assessed at 80, without noting that assessment was prior to the alleged onset date, and without noting that she had been assessed lower scores by various providers on multiple occasions. This was error. While the ALJ was not required to base his decision on GAF scores, he erred in cherry-picking the highest score and ignoring the rest. ***Walters, ibid***.

Plaintiff also argues that the ALJ erred in not giving controlling weight to the opinions of her treating doctor, Dr. Qureshi. With regard to the assessment of treating source opinions, **20 C.F.R. §404.1527(d)(2)** states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u>

[emphasis added]

-13-

A treating physician's opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).** However, "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." ***Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)**. Thus, the contradictory opinions of Dr. Feir and the state agency consultants, who did not examine plaintiff, are not enough.

ALJ Vanderhoof gave no weight to Dr. Qureshi's functional analysis because the "various reports of her treatment" did not indicate any "marked" limitation in her ability to function. He said that she was able to "maintain her household and take care of her elderly mother" and that she testified at the hearing that her activities were "normal." (Tr. 22).

The reasons given by the ALJ for rejecting Dr. Qureshi's opinion are not supported by substantial evidence. His conclusion that the treatment records did not indicate any marked limitations ignores the GAF assessments discussed above. Further, the ALJ's statement that plaintiff testified that her activities were normal is not correct. Plaintiff testified that she has good days and bad days, and, on her worst days, she is not capable of taking care of her daily routine. (Tr. 50). While the ALJ was not required to believe plaintiff's testimony, it was error for him to discredit Dr. Qureshi's opinion based, at least in part, on a misstatement as to her testimony. See, ***Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011)** (error to discount treating doctor's opinion based on a mistake as to the record).

It is also problematic that the ALJ ignored the recommendation of the first impartial medical expert, Dr. Griffin, who said that the medical evidence was not sufficient for her to form opinions about the nature and severity of plaintiff's impairments. She said that a psychological examination and testing should be done. (Tr. 464-468). The ALJ did not explain why Dr.

-14-

Griffin's recommendation was not followed. Instead, a different medical expert testified at the hearing.

The ALJ's treatment of the medical evidence suggests that he may have a faulty understanding of the nature of plaintiff's condition. He emphasized the fact that she "was doing well" on the last visit with Dr. Qureshi, and described her problems as "situational in nature." However, according to the National Institute of Mental Health, "Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. Symptoms of bipolar disorder are severe. They are different from the normal ups and downs that everyone goes through from time to time." (http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml, accessed on October 28, 2011). The state agency consultants and the testifying medical expert agreed with Dr. Qureshi that plaintiff suffers from bipolar disorder. The ALJ erred in characterizing plaintiff's problems as "situational." See, **Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010)**, wherein the Seventh Circuit held that the ALJ erred in concluding that plaintiff's problems were just responses to situational stressors where no doctor had so indicated. Further, the ALJ's reliance on the fact that plaintiff was noted to be doing better at times was misplaced. The Seventh Circuit has observed that a person with bipolar disorder has symptoms that wax and wane, "so a snapshot of any single moment says little about her overall condition." **Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011)**.

The above errors also affected the ALJ's credibility determination. This Court recognizes that an ALJ's credibility determination is entitled to deference and will not be overturned unless patently wrong. **Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008)**. However, here, the ALJ expressed his credibility findings using boilerplate language that has been disapproved by the Seventh Circuit. He said that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (Tr. 21). The Seventh Circuit criticized similar language in *Parker v. Astrue*, **597 F.3d 920, 921-922 (7th Cir. 2010)**, stating that "It is not only boilerplate; it is meaningless boilerplate." As in *Parker*, the ALJ's statement is meaningless because it does not communicate what weight he actually gave the testimony.

It is also problematic that the ALJ rejected plaintiff's testimony to the extent that it did not mesh with his findings as to RFC. This approach "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *Brindisi v. Barnhart*, **315 F.3d 783, 787-788 (7th Cir. 2003)**. This is not to say that every decision which uses this language must be remanded for that reason alone. The credibility determination would pass muster had the ALJ gone on to articulate reasons that had substantial support in the record. However, he did not do so. Rather, he relied on his view that plaintiff's problems were situational and the fact that she had some good days. For the reasons explained above, these reasons are not valid, and the credibility determination is error. See, *McClesky v. Astrue*, **606 F.3d 351, 352-353 (7th Cir. 2010)**, holding that the ALJ's credibility analysis was inadequate where it consisted of a boilerplate statement and picking apart the plaintiff's testimony based on a mistaken view of the evidence.

Plaintiff's other two points are not well-taken. *O'Connor-Spinner v. Astrue*, **627 F.3d 614 (7th Cir. 2010)**, upon which she relies for her second point, requires the ALJ to include limitations in concentration, persistence and pace in the hypothetical question posed to the vocational expert. The ALJ did so here. See, Tr. 52-53. Her point about the GED levels of the jobs identified by the VE is incorrect because GED levels describe educational requirements and not the mental demands of work. *Dictionary of Occupational Titles, 1009-1012 (4th Ed., Rev.*

*1991)*. Thus, there was no conflict between the DOT and the testimony of the VE.

Because the ALJ's decision was erroneous in the respects identified above, this case should be remanded to the Commissioner for further proceedings. It should be understood that this Court is not making any suggestion as to whether plaintiff is, in fact, disabled, or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is itself a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. See, **Shalala v. Schaefer, 113 S. Ct. 2625, 2629 (1993); Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan, 195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate.

### Recommendation

This Court recommends that plaintiff's Motion for Summary Judgment **(Doc. 12)** be **GRANTED**, and the Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **November 17, 2011.**

**Submitted: October 28, 2011.**

                                              **s/ Clifford J. Proud**
                                              **CLIFFORD J. PROUD**
                                              **UNITED STATES MAGISTRATE JUDGE**